FILED
2022 Sep-08  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| BRENDA HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:20-cv-01063-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Brenda Harris appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on her claims for disability benefits, based on her migraines, muscle spasms, back pain, and anxiety.  Doc. 1; Doc. 12-4 at 4.  Plaintiff Harris applied for disability benefits and supplemental security income (SSI) benefits with an alleged onset date of August 15, 2013.  Doc. 12-4 at 5; Doc. 12-6 at 2–9.  The Commissioner denied Harris's claims for benefits.  Doc. 12-3 at 2, 15, 33.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties consented to magistrate judge jurisdiction.  Doc. 14.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

1

## ISSUES FOR REVIEW

In this appeal, Plaintiff Harris argues that the court should reverse the Commissioner's decision because the Administrative Law Judge (ALJ) improperly discredited Harris's testimony under the Eleventh Circuit's "pain standard," such that the ALJ's decision was not supported by substantial evidence.  Doc. 18 at 2. Harris also argues that the ALJ improperly relied on evidence that was not part of the evidentiary record (Doc. 18 at 1), and failed to properly develop the record (Doc. 18 at 12).

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

2

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   if not, whether the claimant has a severe impairment or combination of impairments;

(3)   if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)   if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)   if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national

economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or

substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.   Procedural background

On November 30, 2016, Plaintiff Harris applied for disability insurance benefits under Title II of the Social Security Act. Doc. 12-6 at 2–3. On January 4, 2017, Harris also applied for SSI benefits under Title XVI of the Social Security Act. Doc. 12-6 at 4–9. In her applications, Harris alleged that she became disabled on

August 15, 2013.  Doc. 12-6 at 2, 4.

On February 13, 2017, the SSA initially denied Harris's disability claim (Doc. 12-4 at 36; Doc. 12-5 at 4–8), and her SSI claim (Doc. 12-4 at 37; Doc. 12-5 at 4–8).

The SSA granted Harris's request for a hearing (Doc. 12-5 at 9–13); and, on July 16, 2019, an in-person hearing was held before an ALJ (Doc. 12-3 at 41–59; Doc. 12-5 at 155–56).  A vocational expert or "VE"—Bassey A. Duke—also appeared and testified at the hearing.  Doc. 12-3 at 42, 54–58.

On July 31, 2019, the ALJ issued an unfavorable decision, finding that Harris was not disabled under the Social Security Act.  Doc. 12-3 at 15–34.

On August 5, 2019, Harris appealed that decision through counsel.  Doc. 12-5 at 161–64.  On June 15, 2020, the SSA Appeals Council denied Harris's request for review, finding that there was "no reason under [its] rules to review the [ALJ's] decision."  Doc. 12-3 at 2.

After the Appeals Council denied Harris's request for review (Doc. 12-3 at 2–5), the ALJ's decision became final for purposes of judicial review.  *See* 42 U.S.C. § 405(g).

### B.    Factual background, and the ALJ hearing

Harris was born on November 24, 1970.  Doc. 12-3 at 47; Doc. 12-7 at 15. Harris lives in Alabama with a friend and her friend's family.  Doc. 12-3 at 47; Doc.

12-7 at 39.

In her initial application for benefits, Harris claimed that she became disabled on August 15, 2013 (Doc. 12-6 at 2; Doc. 12-7 at 21), and that she was unable to work because of migraine headaches, muscle spasms, lower back pain, anxiety, and depression (Doc. 12-7 at 20). Harris also stated that she received severance from her last job, but that she had "been missing so many days of work due to [her] headaches that [she] was [on] the verge of being fired already." Doc. 12-7 at 21.

In a work history report dated January 16, 2017, Harris stated that, at her last job at Johnson Controls, she built frames for car seats, which required bending and lifting for the entire shift. Doc. 12-7 at 32. Harris worked in the manufacturing job at Johnson Controls from 2005 until 2012. Doc. 12-7 at 31. In that job she worked 8 to 12 hours per day, 5 days per week. Doc. 12-7 at 32. Before working at Johnson Controls, Harris worked as a supervisor at Bama Dining from 1998 to 2006. Doc. 12-7 at 31.

On January 21, 2017, Harris submitted an adult function report. Doc. 12-7 at 39–46. Harris reported that she did not have a set schedule, and that what she did on a daily basis depended on how she is feeling. Doc. 12-7 at 39. She reported that, "[a]bout 3–4 days a week are especially bad due to muscle spasms and migraines." Doc. 12-7 at 39. She reported that her migraines last "from 1–3 days a week," and that she needs to "[lie] down in a dark place" to deal with the migraines. Doc. 12-7

at 39.   Harris reported that she is no longer able to "hang out with friends, go shopping, to the movie[s], church, and travel," because of her medical conditions. Doc. 12-7 at 40.   Harris also reported that she is able to clean her room and do her laundry, "when [she] feel[s] well enough," and that she does not "cook anymore because most of the time [she is] not feeling well."   Doc. 12-7 at 41.   Harris reported that she was able to walk "[m]aybe 30 minutes" before needing to stop and rest, and that she can follow written and spoken instructions well.   Doc. 12-7 at 44.   Harris reported that she has "1–3 days a week when [she] can[not] function much at all," and that she tries to complete any chores on the days she is feeling well.   Doc. 12-7 at 46.   She reported that during her migraines she is very sensitive to light and noise. Doc. 12-7 at 46.

On January 26, 2017, Dana Emakoji (whom the ALJ's decision refers to as Ms. "Emaloji") submitted a third-party adult function report regarding Harris's limitations.   Doc. 12-7 at 47–54.   Emakoji has known Harris for approximately 25 years, and Harris lives with Emakoji and Emakoji's family.   Doc. 12-7 at 47. Emakoji reported that Harris "suffers from terrible migraines that debilitate her and leave [her] in bed for days at a time."   Doc. 12-7 at 47.   Emakoji reported that, while Harris always has had migraines, they have worsened recently, and that Harris "has become very depressed over not being able to work and not being able to pay bills." Doc. 12-7 at 47.   Emakoji reported that if Harris "is feeling bad or has a headache

she sleeps most of the day," and that Harris "stays in a house gown most days." Doc. 12-7 at 48. Emakoji also reported that Harris is "still a neat and tidy person," who "does not want help," but that it often takes Harris a long time to complete chores because of her medical conditions. Doc. 12-7 at 49.

Emakoji reported that Harris "never leaves home alone," because, while Harris can drive, "she cannot drive if she develops a headache." Doc. 12-7 at 50. Emakoji reported that Harris is not able to go to church or socialize because "different perfumes or colognes people wore would set her migraines off." Doc. 12-7 at 51. Emakoji noted that, while Harris is still able to complete many physical tasks, all of her abilities are limited if she has a migraine, because "sound, light, and all movement make her sick to her stomach." Doc. 12-7 at 52. Emakoji also noted that Harris "is not mentally incompetent" (Doc. 12-7 at 52), and that she believes Harris does not go to the hospital as often as she should "because she does not want to run up another bill" (Doc. 12-7 at 54).

At the July 2019 ALJ hearing, Harris testified that she had not worked since August 15, 2013, the alleged onset date of her disability. Doc. 12-3 at 49. Harris testified that she has problems with degenerative disc disease, major joint dysfunction, migraines, and depression, as well as carpal tunnel syndrome and high blood pressure. Doc. 12-3 at 49.

Harris testified that she has multiple triggers for her migraines, including

"smells, like loud perfumes, soaps, anything that's loud," "noisy places," and if she gets too hot.  Doc. 12-3 at 51.  Harris also testified that she is light sensitive, and that when she has a migraine she has to "[lie] down, get in a dark room."  Doc. 12-3 at 51.  She also testified that sometimes her migraines "last days," and that sometimes she "can take medicine and [lie] down" and the migraines will stop.  Doc. 12-3 at 52.

Harris also testified that she was being treated for depression, and that she had received counseling in the past, but that it had not "picked back up."  Doc. 12-3 at 53.  She testified that her carpal tunnel syndrome wakes her up because her hands are "numb and tingly."  Doc. 12-3 at 54.

Harris testified that she last worked from 2005 to 2012 at Johnson Controls in a manufacturing assembly role.  Doc. 12-3 at 49.

Bassey Duke (the vocational expert or "VE") also testified at the ALJ hearing.  Doc. 12-3 at 54–58.  Duke described Harris's past work as a food court supervisor as a light, skilled job, and her past work as an assembler as a medium, unskilled job.  Doc. 12-3 at 55.  Duke testified that an individual with the same age, education, and work experience as Harris, who is capable of light work, cannot work in direct sunlight, cannot be exposed to certain workplace hazards, can only work in job environments where the noise intensity level does not exceed moderate, and can occasionally be exposed to irritants, could not perform Harris's past work.  Doc. 12-

3 at 56.  However, Bassey testified that the same hypothetical individual could find jobs in the national economy.  Doc. 12-3 at 56.  Those jobs include work as a price marker, cashier, or packager.  Doc. 12-3 at 56–57.

In addition, Duke testified that a similar hypothetical individual, whose impairments caused her to miss work 4 days out of a month or be off task 20 percent or more of a normal workday would not be able to find competitive employment. Doc. 12-3 at 57.  Duke further testified that, even if that hypothetical individual were absent only two days per month, it would "preclude any form of competitive employment."  Doc. 12-3 at 57.

C.    The ALJ's decision

On August 5, 2019, the ALJ issued an unfavorable decision on Harris's claims.  Doc. 12-3 at 15–34.  The ALJ found that Harris was insured through December 23, 2017, and was required to establish disability on or before that date in order to be entitled to disability insurance benefits.  Doc. 12-3 at 19, 20.

At step one of the sequential analysis, the ALJ found that Harris had not engaged in substantial gainful activity since August 15, 2013, her alleged onset date.  Doc. 12-3 at 20.

At step two, the ALJ found that Harris had severe impairments of obesity, degenerative disc disease, migraines, carpal tunnel syndrome, and depression.  Doc. 12-3 at 21.  The ALJ also found that, while Harris had a history of hypertension,

the ALJ could not conclude that hypertension was a severe impairment for purposes of the disability determination.  Doc. 12-3 at 21.

At step three, the ALJ found that Harris did not have an impairment or combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments"—including "Listing 1.04," "Listing 11.02," "Listing 11.14," and "Listing 12.04."  Doc. 12-3 at 21–22.  The ALJ also reviewed SSR 19-2P to determine if Harris's obesity exacerbated any other condition to the point of meeting a Listing, but ultimately concluded that it did not.  Doc. 12-3 at 22.

The ALJ then found that Harris had the "residual functional capacity" (RFC) to perform light work, "except she can frequently stoop, kneel, crouch, crawl, handle and finger bilaterally; but never climb ladders, ropes, or scaffolds.  She can occasionally be exposed to irritants, such as fumes, odors, dust, and gases; but never work in direct sunlight, but can [work] in job environments where the noise intensity level does not exceed moderate . . . . She can never be exposed to workplace hazards, such as moving mechanical parts and high, exposed places; and is limited to simple and routine tasks, but not at a production rate pace.  She has the ability to make simple work-related decisions, and can tolerate occasional changes in the work setting."  Doc. 12-3 at 27.

At step four, the ALJ concluded that Harris was unable to perform any of her past relevant work.  Doc. 12-3 at 32.  But (at step five), after considering Harris's

age, education, work experience, and RFC, the ALJ found that there were jobs that exist in significant numbers in the national economy that Harris could perform. Doc. 12-3 at 33.

Consequently, the ALJ determined that Harris was not disabled under the Social Security Act. Doc. 12-3 at 33. Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I. The ALJ properly evaluated Plaintiff Harris's subjective testimony regarding her migraines and pain.

The ALJ properly evaluated Plaintiff Harris's subjective testimony regarding her migraine headaches and her pain. The ALJ's decision was based on the multi-part "pain standard," and substantial evidence supported the ALJ's decision not to credit Plaintiff Harris's subjective testimony regarding her pain.

### A. The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard." When a claimant attempts to establish disability through her own testimony concerning pain or other subjective symptoms, the multi-step "pain

13

standard" applies.  That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also* 20 C.F.R. § 404.1529 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [her] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled."  20 C.F.R. § 404.1529(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard.  In analyzing Harris's residual functional capacity (RFC), and the extent to which Harris's symptoms limited her functioning, the ALJ's decision reasoned that the ALJ "must follow" the required "two-step process":  (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the

claimant's functional limitations." Doc. 12-3 at 27–28. Thus, the ALJ's decision was based on the proper legal standards.

**B.    Substantial evidence supported the ALJ's decision to discredit Harris's subjective testimony regarding her pain from migraines.**

Furthermore, substantial evidence supported the ALJ's decision not to credit Harris's subjective testimony regarding her pain, and to find that Harris was not disabled.

**1.    The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.**

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony. *Wilson*, 284 F.3d at 1225. A claimant can establish that she is disabled through her "own testimony of pain or other subjective symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements." 20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ must consider all

of the evidence, objective and subjective.   20 C.F.R. § 404.1529.   Among other

things, the ALJ considers the nature of the claimant's pain and other symptoms, her

precipitating and aggravating factors, her daily activities, the type, dosage, and

effects of her medications, and treatments or measures that she has to relieve the

symptoms.  *See* 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if

the ALJ decides to discredit a claimant's subjective testimony "about the intensity,

persistence, and limiting effects of [her] symptoms."   20 C.F.R. § 404.1529(c)(4).

If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must

articulate explicit and adequate reasons for doing so."  *Holt v. Sullivan*, 921 F.2d

1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence

in the record will not be disturbed by a reviewing court."  *Foote v. Chater*, 67 F.3d

1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d

780, 792 (11th Cir. 2014) (similar).  "The credibility determination does not need to

cite particular phrases or formulations but it cannot merely be a broad rejection

which is not enough to enable . . . [a reviewing court] to conclude that the ALJ

considered [the claimant's] medical condition as a whole."  *Dyer*, 395 F.3d at 1210

(quotation marks and alterations omitted).[1]  "The question is not . . . whether [the]

---

[1] The Social Security regulations no longer use the term "credibility," and have

ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

> **2.    The ALJ properly explained the decision not to credit Harris's subjective testimony regarding her pain, and substantial evidence supported that decision.**

The ALJ properly explained the decision to discredit Harris's subjective testimony regarding her pain, and substantial evidence supported the ALJ's decision. In her brief, Harris argues that the ALJ "did not give a clear list of reasons for why he rejected [Harris's] testimony about her incapacitating migraines," and that the ALJ instead summarized "what he perceived to be pertinent medical findings that, in his lay opinion, were inconsistent with a claim of disability." Doc. 18 at 7. However, the ALJ's decision not only articulated and tracked the multi-part "pain standard" (*see* Part I.A *supra*), but also tracked the Eleventh Circuit law and applicable regulations for evaluating a claimant's subjective testimony (discussed

---

shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

above in Part I.B.1 *supra*).

Citing 20 C.F.R. § 404.1529, the ALJ's decision stated that the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." Doc. 12-3 at 27. And, consistent with 20 C.F.R. § 404.1529, the ALJ explained that, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [the ALJ] must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 12-3 at 28.

In determining Harris's RFC according to the pain standard, the ALJ then found that "the documentary evidence establishes underlying medical conditions capable of producing some pain or other limitations." Doc. 12-3 at 28.

But the ALJ found that "substantial evidence does not support the conclusion that the objectively determin[able] medical conditions are of such severity that they could reasonably be expected to give rise to disabling pain and other limitations." Doc. 12-3 at 28.

"However," the ALJ *did* "find that the claimant's underlying medically determinable impairments, which are established by medically acceptable clinical and laboratory diagnostic techniques, can reasonably be expected to produce *some* symptoms." Doc. 12-3 at 28 (emphasis added).

The ALJ reviewed Harris's testimony from the ALJ hearing that she "experienced migraines 1–4 days per week, which were triggered by smells, such as loud perfumes or soaps, noisy places, or if she became too hot."  Doc. 12-3 at 29. The ALJ also reviewed Harris's testimony that, "when she was experiencing a migraine, she had to go into a dark room, because she was light sensitive and [lie] down."  Doc. 12-3 at 29.

The ALJ explained that the RFC findings were based "upon consideration of all relevant evidence in the entire case record, including, but not limited to, the medical signs and laboratory findings, *statements and other information provided by [Harris]*, by treating or examining physicians, or psychologist and other persons." Doc. 12-3 at 30 (emphasis added).  The ALJ's decision stated further that, "[i]n the assessment of [Harris's RFC]," the ALJ "considered [Harris's] treatment records," and that "additional impairments and limitations were indicated within the subsequent medical evidence of record and *[Harris's] testimony*."  Doc. 12-3 at 31 (emphasis added) (discussing Dr. Gloria Sellman's opinions and noting again the ALJ's "consideration of [Harris's] testimony").

The ALJ then found that "the intensity, frequency, duration, and functionally limiting effects of [Harris's] symptoms, including pain, preclude [Harris] from performing greater than light exertional tasks, with only frequent postural maneuvers, and safety restrictions," that Harris "was capable of only frequent

handling or fingering bilaterally," and that—"in order to establish a work environment that would minimize the various environmental triggers of [Harris's] reported migraines"—"she could have only occasional exposure to pulmonary irritants[,] no work in direct sunlight[,] and only in areas with no greater than a moderate noise level."  Doc. 12-3 at 30–31.

In short, the ALJ's decision explains that—in reaching the RFC determination—the ALJ evaluated Harris's subjective testimony about the intensity, persistence, and limiting effects of her symptoms, and considered all of the evidence, objective and subjective.  *See* Doc. 12-3 at 27–32; 20 C.F.R. § 404.1529.

In addition, the ALJ articulated explicit and adequate reasons for discrediting Harris's testimony that her conditions "[we]re of such severity that they could reasonably be expected to give rise to disabling pain and other limitations."  *See* Doc. 12-3 at 28; *Holt*, 921 F.2d at 1223.

With respect to her migraine headaches, the ALJ first found that Harris's "records reflect multiple reports of, and treatment for, headaches, which are inconsistent with the frequency of incapacitating migraine headaches alleged."  Doc. 12-3 at 28.   Among other things, the ALJ found that, "despite her report of longstanding headaches," Harris had been "able to work successfully until 2012"— when she was laid off for reasons unrelated to her medical conditions.  Doc. 12-3 at 28.

The ALJ also found that, while Harris "reported an increased frequency in her headaches" after August 2013, her medical records "fail to show frequent complaints of migraines," and that, when she was seen in an emergency room for a headache in January 2014, Harris characterized the headache as "mild" and believed it was a sinus headache.  Doc. 12-3 at 28; *see* Doc. 12-10 at 56–67.

The ALJ found that, although Harris told a consultative examiner in March 2015 that she was having more than 10 severe migraine headaches a month, "there was no evidence of intervening emergency room visits for headaches of any kind" between January 2014 and March 2015.  Doc. 12-3 at 28.

The ALJ also found that in 2015 Harris had medical appointments for headaches on multiple occasions, but that on at least three of those occasions the medical records noted sinus symptoms at the time of the visit, and that Harris characterized the severity of one of those headaches as "only moderate."  Doc. 12-3 at 28; *see* Doc. 12-10 at 68–99, 158–65, 184.

The ALJ found that in April 2016 Harris told her neurologist (Dr. Thomas Emig) that she experienced severe migraines "several times a week," but Dr. Emig "reported that [she] was in no acute distress, demonstrated unremarkable attention and concentration," demonstrated "grossly unremarkable cognitive function," and her "[p]hysical findings were unremarkable as well."  Doc. 12-3 at 29; *see* Doc. 12-10 at 13.

21

The ALJ found further that on two other occasions, when Harris sought medical care for migraines in 2016, she "complained of sinus congestion/infection at both of those visits," and characterized the severity of the headaches as "moderate" at both visits. Doc. 12-3 at 29; *see* Doc. 12-10 at 32, 39, 115–26. And, in November 2016, Harris presented to the hospital for an evaluation of a migraine, but "indicated that the severity was only moderate in nature and had improvement with medication." Doc. 12-3 at 29; *see* Doc. 12-10 at 24.

The ALJ found a similar pattern in 2017. For example, in February 2017, Dr. Sellman (a non-examining physician, reviewing for the state agency) opined that Harris could perform light exertional tasks. Doc. 12-3 at 29. In March 2017, Harris's physician (Dr. Jimmy Tu) observed that she "was in no acute distress" and "did not appear uncomfortable," and at a May 2017 emergency department visit Dr. Martin Smith reported that Harris "was in no apparent distress" and had a "normal neurological examination." Doc. 12-3 at 29; *see* Doc. 12-11 at 25–27, 39. Further, at an August 2017 appointment, a physician (Dr. Frederick Jones) classified Harris's "primary difficulty as acute sinusitis," even though she presented for evaluation of a migraine. Doc. 12-3 at 29. The ALJ also found that a CT scan in October 2017 revealed "no acute intracranial abnormality." Doc. 12-3 at 30; *see* Doc. 12-11 at 9–10.

The ALJ considered the March 2018 and January 2019 statements from Dr.

Emig, Harris's neurologist, that it would be difficult for Harris to maintain employment given her headache history (Doc. 12-3 at 30; *see* Doc. 12-11 at 202; Doc. 12-12 at 10); but the ALJ gave those statements little weight because they relied on Harris's subjective reports regarding the frequency, severity, and duration of her migraines, and because the statements were not supported by the longitudinal medical records (Doc. 12-3 at 32).  The ALJ also reasoned that the "determination of disability or the ability of the claimant to perform work activity is a matter reserved for the Commissioner."   Doc. 12-3 at 31–32; *see* 20 C.F.R. § 416.920b(c)(3); *Everett v. SSA*, 777 F. App'x 422, 424 (11th Cir. 2019).

In her brief, Harris quotes the First Circuit's decision in *Manso-Pizarro v. Secretary of Health and Human Services*, 76 F.3d 15, 17 (1st Cir. 1996), and argues that the ALJ should have consulted a medical expert in analyzing her medical records because the ALJ is a "lay person," and consequently "is not qualified to interpret raw data in a medical record."  Doc. 18 at 10 (quotation marks omitted).  But, as stated above, "the ability of the claimant to perform work activity is a matter reserved for the Commissioner."   Doc. 12-3 at 31–32; *see* 20 C.F.R. § 416.920b(c)(3); *Everett*, 777 F. App'x at 424.  In any event, the First Circuit's decision in *Manso-Pizzaro* involved a serious heart condition with complex medical records, not the more routine chart notes and medical opinions that the ALJ analyzed in this case. *See* 76 F.3d 15 at 18 ("During the claimant's 12-day hospital stay, seven

23

electrocardiograms combined conclusively to show sinus tachycardia. Two chest x-rays revealed an enlarged heart. No fewer than five physicians were asked to consult."). Indeed, the First Circuit's decision recognizes that, ordinarily, "an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *See id.* at 17.

In her brief, Harris also argues that the ALJ erred in rejecting Harris's testimony as "inconsistent with her daily activities," and in failing to provide an "explanation for why these [daily] activities would be inconsistent with her claims about her migraines." Doc. 18 at 10. But the ALJ made the "determin[ation]" that Harris quotes in support of this argument "*given the presence of [Harris's] carpal tunnel syndrome*," not her migraines. Doc. 12-3 at 31 (emphasis added) ("[G]iven the presence of carpal tunnel syndrome, I determined that after reviewing the claimant's admitted activities, such as cleaning her room and the bathroom, that she was capable of only frequent handling or fingering bilaterally."); *see* Doc. 18 at 10. Furthermore, while Harris's brief also quotes the ALJ's discussion of a January 21, 2017 function report with regard to her daily activities, the ALJ discussed that report as part of Harris's medical background at step three of the sequential disability analysis. As noted above, the ALJ determined that Harris did not have an impairment or combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments," and in this appeal Harris has not challenged

24

that finding.

Moreover (and as noted above), while the ALJ found that the objective medical evidence did not fully support Harris's subjective testimony regarding extreme limitations or restrictions, the ALJ did not completely discredit her testimony.  Instead, the ALJ found that the record *did* support limitations to the light exertional level with only frequent postural maneuvers and "safety restrictions" to accommodate her migraines.  Doc. 12-3 at 30–31.  And the ALJ provided that Harris would need a work environment that minimized "the various environmental triggers" for her reported migraines.  Doc. 12-3 at 31.

Thus, the ALJ's decision accounted for Harris's subjective testimony regarding her migraines in the RFC determination, considered all of the objective and other evidence in the record, and included the necessary "explicit and adequate reasons" for discrediting Harris's subjective testimony that she could not work on account of her migraines.  *Wilson*, 284 F.3d at 1225.  The ALJ "considered [Harris's] medical condition as a whole," and did not make a "broad rejection" of her subjective testimony.  *See Dyer*, 395 F.3d at 1210

In this regard, substantial evidence supported the ALJ's decision not to credit Harris's subjective testimony regarding her pain, and to find that Harris was not disabled.  As explained above, the ALJ's decision contains a thorough consideration of the record evidence, including Harris's testimony, a third-party opinion from her

25

housemate (Dana Emakoji), the opinion of her treating physician, Harris's treatment history with respect to migraines, the results of objective testing, and the medications she was prescribed. Accordingly, the ALJ appropriately considered Harris's testimony regarding her migraine headaches, and evaluated the medical and other evidence to determine what limitations Harris had from migraine headaches.

In her brief, Harris argues that the ALJ improperly discredited Emakoji's statements. Doc. 18 at 12. Harris argues that the "only reason that the ALJ gave for not fully crediting [Emakoji's] statement" was that Emakoji's friendship with Harris meant that she could not be a disinterested third party. Doc. 18 at 12 (citing Doc. 12-3 at 26). But the ALJ's decision makes clear that the ALJ afforded Emakoji's statement "partial weight" not just because of her relationship with Harris, but also because Emakoji "is a non-medical source" who "is not medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms," and considering "the extent to which [Emakoji's] statement is consistent with other evidence, as well as other factors that tend to support or refute the evidence." Doc. 12-3 at 26.

As explained above, the question is not whether the ALJ "could have reasonably credited [Harris's] testimony, but whether the ALJ was clearly wrong to discredit it" (*Werner*, 421 F. App'x at 939), and the court cannot "re-weigh[] the

26

evidence or substitute[e] [its] judgment for that [of the Commissioner] . . . even if the evidence preponderates against the [ALJ's] decision" (*Moore*, 405 F.3d at 1213 (citation and quotation marks omitted)).

In sum, there is sufficient evidence in the record based on which a reasonable person would accept the ALJ's findings that Harris's testimony was not consistent with the record, and that Harris was not disabled.  *See Crawford*, 363 F.3d at 1158 (where there is substantial evidence, a court must affirm the ALJ's decision, "[e]ven if the evidence preponderates against the Commissioner's findings" (quoting *Martin*, 894 F.2d at 1529)).  Accordingly, substantial evidence supported the ALJ's decision.

## II.    The ALJ did not violate Harris's due process rights by considering two opinions from a previous SSA proceeding, and did not err in not further developing the record.

The ALJ did not violate Harris's due process rights by considering two opinions from a previous SSA disability proceeding, and did not err in not further developing the record.  Harris argues that the ALJ improperly relied on evidence that was not part of the evidentiary record, which violated her due process rights (Doc. 18 at 1), and that the ALJ failed to properly develop the record (Doc. 18 at 12).

While it is the ALJ's responsibility to develop a "full and fair" record, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded." *Graham*

*v. Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997).   The Eleventh Circuit has instructed that "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice."   *Graham*, 129 F.3d at 1423 (quotation marks omitted).

First, Harris argues that the ALJ erred by relying on two consultative examinations from a previous SSA disability determination.  Doc. 18 at 1–2.  The ALJ's decision referenced a consultative examination conducted by Joe Dixon, PhD, in March 2015.  Doc. 12-3 at 23.  The ALJ discussed this consultative examination as part of Harris's medical background that the ALJ considered at step three of the sequential disability analysis, in determining that Harris did not have an impairment or combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments."  The ALJ specifically noted that, during her consultative exam with Dr. Dixon, Harris denied any history of psychiatric or psychological treatment, and denied any significant depression.  Doc. 12-3 at 23.  The ALJ also noted that, during the exam with Dr. Dixon, Harris's concentration and attention were within normal limits, and that she had clear cognition.  Doc. 12-3 at 23.

The ALJ also mentioned a consultative examination conducted by Frederick Ernst, MD, in March 2015.  Doc. 12-3 at 28.  The ALJ discussed Dr. Ernst's consultative examination—in one sentence—as part of Harris's medical background that the ALJ reviewed in determining Harris's RFC at step four of the sequential

analysis.  *See supra* Part I.  The ALJ noted only that Harris told Dr. Ernst that "she was having more than 10 migraine headaches a month, accompanied by photophobia, phonophobia, nausea, and vomiting that required her to lie down in a cool dark room."  Doc. 12-3 at 28.

As explained above, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded."  *Graham*, 129 F.3d at 1422–23.  Here, Harris has not demonstrated that she was prejudiced by the ALJ's minimal review of these consultative examinations.

The ALJ's review of Dr. Dixon's consultative examination was included along with a review of records from Harris's neurologist (Dr. Emig), Harris's own testimony, Emakoji's third-party function report, records from Harris's emergency room visits, the opinion of a non-evaluating psychiatrist (Dr. Robert Estock), and an extensive review of therapy notes from Harris's treating counselor (Mulla Mohamed).  Doc. 12-3 at 22–26.  Again, this was at step three of the sequential analysis, where the ALJ found that Harris's mental impairments did "not meet or medically equal the criteria for listing 12.04."  Doc. 12-3 at 22.  Harris has not challenged that finding on appeal, and so cannot demonstrate the necessary prejudice.

In addition, Dr. Dixon's consultative examination was consistent with the

other records that the ALJ reviewed at length.  Even if the ALJ had not mentioned

Dr. Dixon's report, the conclusion that Harris did not meet Listing 12.04 would not

have changed, so any error would have been harmless.  Because Harris cannot show

that she was prejudiced by the ALJ's brief reference to Dr. Dixon's consultative

examination, there is no error in that regard.

Likewise, not only was the ALJ's mention of Dr. Ernst's records minimal (one

sentence), but also it weighed in Harris's favor.  Because that evidence weighed in

support of a disability finding, any error would have been harmless anyway.  As

explained above (*see supra* Part I), the ALJ completed a detailed review of Harris's

migraine history to determine whether to credit her testimony regarding the severity

of her migraines.  Dr. Ernst's examination indicated that Harris had stated that she

was having "more than 10 migraine headaches a month," even in March 2015, more

than 4 years before the ALJ hearing.  Doc. 12-3 at 28.  Because Harris cannot show

that she was prejudiced by the ALJ's one-sentence reference to Dr. Ernst's

consultative examination, there was no error.

Second, Harris argues that the ALJ should have further developed the record.

Doc. 18 at 12–14.  But Harris has not made any showing that the ALJ was required

to do more to develop the evidentiary record.  When a plaintiff's medical sources

"cannot or will not give [the SSA] sufficient medical evidence about [the plaintiff's]

impairment," the SSA *may* order one or more physical or mental examinations or

tests to assist in the disability determination.  20 C.F.R. §§ 404.1517, 416.917. However, an ALJ is not required to order a consultative examination, "unless the record establishes that such an examination is necessary to enable the [ALJ] to render a decision." *Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir. 1988) (quoting *Ford v. Secretary of Health & Human Servs.*, 659 F.2d 66, 69 (5th Cir. 1981)).  That general rule makes good sense because the ALJ's decision requires substantial evidence, not absolute certainty.  *Id.*  Consequently, if an ALJ can reach a disability determination based on substantial evidence already in the record, then the ALJ is not required to develop further the record evidence.  *Id.*

Here, Harris's brief shows no reason for the ALJ to have developed the record further.  Harris only speculates that the ALJ's determination might change if the ALJ sought additional testimony from an expert.  But, "[t]he Commissioner, not a physician, is responsible for determining a claimant's RFC and whether a claimant is statutorily disabled."  *Everett*, 777 F. App'x at 424 (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)).

For instance, Harris argues that "[t]here was no medical opinion in this administrative record to explain whether any of the findings in the medical records contradicted" Dr. Estock's opinion that Harris's "depression would likely cause her to be absent from work 1-2 days per month due to her psychiatric symptoms," and that the ALJ should not have "rel[ied] upon his own lay understanding of the

31

evidence to deny the claimant's claim." Doc. 18 at 13; *see also* Doc. 18 at 4 (discussing Dr. Estock's opinion); Doc. 18 at 5 (discussing vocational expert's testimony). But, in determining Harris's RFC, the ALJ specifically "evaluated Dr. Estock's assessment and afforded [it] only slight weight" because "[Dr. Estock's] opinions are not supported by the longitudinal treatment records, which do[] not support the claimant being absent consistently." Doc. 12-3 at 31. Indeed, the ALJ acknowledged that Dr. Estock had "indicated that [Harris] was likely to miss 1-2 days of work per month," but found that "there is no indication within the record that the claimant would consistently be absent 1-2 days per month." Doc. 12-3 at 31. Again, any finding regarding Harris's ability to work is a matter reserved for the Commissioner (*see Everett*, 777 F. App'x at 424), and Harris has identified neither an error in the ALJ's consideration of Dr. Estock's opinion, nor any reason for the ALJ to have expanded the record in this regard.

Harris also argues that, if the ALJ were "'in doubt as to the validity of [Plaintiff's impairments], he should have sought clarification of the test results or ordered additional testing.'" Doc. 18 at 14 (quoting *Carril v. Barnhart*, 201 F. Supp. 2d 1190, 1192 (N.D. Ala. 2002)). Harris suggests that the ALJ "could have requested a medical expert" to "explain the significance of the medical findings and their relevance to migraine headaches." Doc. 18 at 14. But, in this case, there is no reason to suppose that the ALJ was in any doubt as to the validity of Harris's

impairments, or that any such "medical expert" would be necessary or appropriate. As explained above, the ALJ found at step two of the sequential analysis that Harris suffered from multiple severe impairments, including migraines.  Doc. 12-3 at 21. While Harris disagrees with the ALJ's RFC determination at step four, Harris's argument for further factual development is based on the premise that there was "inadequate evidence" in the record to deny her claim, and that the ALJ was "responsible" for that supposed "inadequa[cy]."  Doc. 18 at 14.  But, as discussed above (*see supra* Part I), substantial evidence supported the ALJ's decision, and nothing required the ALJ to order a consultative examination or a medical expert to testify about Harris's migraines.  *See* Doc. 18 at 14; *Holladay*, 848 F.2d at 1210.

As explained above (*see supra* Statutory And Regulatory Framework), Harris carries the burden of proof to establish disability, and "[i]t is not unreasonable to require the claimant, who is in a better position to provide information about [her] own medical condition, to do so."  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5.  Here, Harris has not identified any "evidentiary gaps" that "result[ed] in unfairness or clear prejudice" (*Graham*, 129 F.3d at 1423), or that indicate any additional information was necessary or appropriate.  Again, the determination of Harris's RFC and the decision whether she is "statutorily disabled" was for the Commissioner (i.e., the ALJ), and not for an additional, hypothetical consulting "physician" or medical expert.  *See Everett*, 777 F. App'x at 424.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court

**AFFIRMS** the Commissioner's decision.  The court separately will enter final

judgment.

**DONE** and **ORDERED** this September 8, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE